*35
 
 OPINION OF THE COURT
 

 Meyer, J.
 

 The standard governing distribution of the assets of a charitable corporation being dissolved under the Not-For-Profit Corporation Law (N-PCL § 1005 [a] [3] [A]; § 1008 [a] [15] ["engaged in activities substantially similar to”]) is less restrictive and accords greater authority to the corporation’s board of directors and the courts than governs the distribution of the assets held by a trustee under a will or other instrument making a disposition for charitable purposes (EPTL 8-1.1 [c] ["will most effectively accomplish its general purposes”]) or the assets held by the officers and trustees of a voluntary association which has received by public subscription a fund for charitable purposes from more than 1,000 contributors (EPTL 8-1.1 [j] ["will most effectively accomplish the general purpose for which such fund was collected”]) or than was the cy pres standard at common law ("as nearly as possible”). Under the quasi cy pres standard of the Not-For-Profit Corporation Law, a Supreme Court Justice in determining whether to approve the plan of distribution proposed by the corporation’s board, and if not to what other charitable organizations distribution should be made, should consider (1) the source of the funds to be distributed, whether received through public subscription or under the trust provision of a will or other instrument; (2) the purposes and powers of the corporation as enumerated in its certificate of incorporation; (3) the activities in fact carried out and services actually provided by the corporation; (4) the relationship of the activities and purposes of the proposed distributee^) to those of the dissolving corporation, and (5) the bases for the distribution recommended by the board. The order of the Appellate Division should, therefore, be reversed, with costs to appellants, and the matter remitted to Supreme Court for a hearing in accordance herewith.
 

 I
 

 Petitioner, the Multiple Sclerosis Service Organization of New York, Inc. (MSSO), was incorporated in 1965 under the Membership Corporations Law. After adoption of the N-PCL it filed an amended certificate of incorporation which, among other things, declared it to be a type B corporation under that
 
 *36
 
 law.
 
 [1]
 
 It was formed in 1965 by a group of volunteers who had been associated with the Kings County Multiple Sclerosis Society (Kings County Chapter), a chapter of the National Multiple Sclerosis Society (National Society), but who withdrew from the chapter in 1965 because they wished to focus primarily upon rehabilitation — helping MS victims to function in society to their maximum potential — while the National Society focused primarily upon research. It has neither been affiliated with nor has it had financial assistance from the National Society or any of its chapters. Its purposes, as stated in its amended certificate of incorporation, are to operate a recreational center for the use of MS victims and provide means of recreation and snacks and lunch to them while at the center; to transport them to and from medical, hospital and other service appointments and to and from restaurants and places of entertainment; to provide them with and keep in repair the specialized equipment needed by such victims, including walkers, hospital beds, controls for motor vehicles and exercise equipment; to furnish counseling services to them relating to their conditions; to make grants to those engaged in MS research and to solicit and receive funds for the purposes mentioned and for the benefit of said victims. The petition in the instant proceeding explained MSSO’s function as an attempt "to create and service a community where multiple sclerosis victims
 
 could
 
 again
 
 engage
 
 in the business of life, which had all but ended for them in the outside world.”
 

 For 17 years MSSO operated a center in Brooklyn to which its members brought patients three times a week, providing them while there with snacks, lunch and recreational and social activities. They also provided transportation, equipment, counseling services and other therapies as envisioned by the corporation’s certificate. In 1982, however, dwindling finances and the advancing age of its members resulted in the determination that MSSO could no longer continue its activities. According to the affidavit of its president accompanying the petition, the New York City Chapter was asked to take over the service center but declined to do so.
 
 [2]
 
 The board then
 
 *37
 
 determined, after a meeting on notice to all members of the corporation, to sell the Brooklyn service center — its principal asset — pay its debts and select recognized charities to receive any assets remaining.
 

 Sale of the center was approved by Supreme Court, its order providing that any money remaining after payment of obligations be donated to "recognized charities.” A committee was then appointed to find distributees engaged in substantially similar activities. Those organizations the committee deemed likely candidates it inspected, making unannounced visits at irregular hours. Four organizations were selected primarily because of their emphasis upon on-site care and service to clients suffering from irreversible and chronic medical conditions requiring expensive long-term treatment: Blueberry Treatment Centers, Inc. (Blueberry), Adult Retardates Center, Inc. (ARC), Vacations and Community Services for the Blind (Vacations and Community Services) and Children’s Oncology Society of New York, Inc. (Children’s Oncology).
 
 [3]
 
 After the board adopted a resolution providing for distribution of the approximately $155,000 remaining, 40% to Blueberry, 25% to ARC, 25% to Vacations and Community Services and 10% to Children’s Oncology, the petition in the present proceeding seeking Supreme Court approval of the proposed distribution was filed, on notice to the Attorney-General, as required by N-PCL § 1002 (d).
 

 The New York City Chapter sought leave to intervene, asserting that its activities were "more akin” to those of MSSO than the four distributees selected and that it expends a substantial portion of its annual budget on direct services to MS victims, including patients formerly serviced by MSSO. Pursuant to stipulation, it and the four proposed distributees were permitted to intervene. New York City Chapter then filed an answer which included an objection in point of law that funds donated to MSSO were specifically donated for aid
 
 *38
 
 to victims of multiple sclerosis and would be improperly diverted if distributed to other than MS-oriented charities. The Attorney-General’s answer stated as an affirmative defense that the proposed distributees are not engaged in activities substantially similar to those of MSSO.
 

 Petitioner and the proposed distributees other than Children’s Oncology, which did not appear, moved to strike New York City Chapter’s answer and the Attorney-General’s affirmative defense. Special Term, finding that the distributees were engaged in activities substantially similar to those of MSSO "in that each renders services to permanently disabled people which enable them to function to their maximum potential”, struck the objection in point of law from the chapter’s answer and the affirmative defense from the Attorney-General’s answer and approved the proposed distribution.
 

 The Appellate Division unanimously reversed. Concluding that despite its use of "substantially similar” the N-PCL provisions incorporated the "as nearly as possible” cy pres standard of the common law and emphasizing the presumed intent of donors to MSSO to benefit MS victims, it remitted to Special Term for a factual hearing. No formal evidentiary hearing was held, however, the parties having stipulated concerning the services rendered by New York City Chapter and the four distributees as set forth in specified portions of the record, and specifically that New York City Chapter provides services exclusively to MS victims but that the four distributees do not provide services to MS patients unless they suffer from disabilities other than MS as well. On the basis of that stipulation and of the Appellate Division’s decision, Special Term concluded that the distributees did not meet the statutory requirement and that New York City Chapter did.
 

 From the judgment entered on that decision petitioner appeals to us pursuant to CPLR 5601 (d), bringing up for review the Appellate Division’s prior nonfinal order. We conclude that in equating "substantially similar” with "as near as possible,” the Appellate Division erred. We, therefore, reverse and remit to Supreme Court for a hearing.
 

 II
 

 The question before us is not whether principles of a cy pres nature apply to the distribution of the assets of a dissolving charitable corporation but what the governing principle is. There is no question that the common-law cy pres standard
 
 *39
 
 was "as near as possible,” that being the literal translation of the Anglo-French from which the words were taken (Bogert, Trusts and Trustees § 431, at 490 [2d ed rev]; 4 Scott, Trusts § 399, at 3084 [3d ed]). There likewise is no question that the Memorandum of the Joint Legislative Committee to Study Revision of Corporation Laws referred to the provision now contained in N-PCL § 1005 (a) (3) (A) as "a codification of the 'cy-pres’ doctrine” (1969 NY Legis Ann, at 139, reprinted in McKinney’s Cons Laws of NY, Book 37, p xxii). But in concluding that, as to the distribution by such a corporation of assets other than those received through a will or similar instrument, the common-law standard applies notwithstanding the substantially different language of N-PCL § 1005 (a) (3) (A), the Appellate Division failed to consider the history of cy pres in New York, its statutory development in this State generally and in relation to charitable corporations, and the very different wording of the N-PCL standard from that of related statutes and that used to express the common-law rule and thus fell into error.
 

 A
 

 A nonjudicial dissolution of a type B corporation, such as is here involved, is governed by N-PCL article 10.
 
 [4]
 
 It begins with the adoption by the board of directors of a plan for dissolution and distribution of the corporation’s assets (§ 1001). After submission to and approval by members of the corporation entitled to vote, the plan must be submitted to the Supreme Court in the judicial district in which the office of the corporation is located (§ 1002). The first sentence of section 1005 (a) (3) (A) requires distribution, after payment of liabilities, of "[assets received and held by the corporation for a purpose specified as Type B * * * or which are legally required to be used for a particular purpose
 
 [5]
 
 * * * to one or more domestic or
 
 *40
 
 foreign corporations or other organizations engaged in
 
 activities substantially similar to
 
 those of the dissolved corporation pursuant to a plan of distribution adopted as provided in section 1001 * * * or as ordered by the court to which the plan is submitted for approval under section 1002.”
 
 [6]
 
 Finally section 1008 (a) (15) authorizes the Supreme Court to order distribution of assets received and held by the corporation for a type B purpose or which are "legally required to be used for a particular purpose * * * to one or more domestic or foreign corporations or other organizations engaged in
 
 activities substantially similar to
 
 those of the dissolved corporation”.
 

 Apparent from those provisions is the Legislature’s intention to require that assets given to a charitable corporation for a particular purpose be used by the corporation while it is
 
 *41
 
 in existence for the purpose specified by the donor, unless the restriction is released by the donor or by a court (N-PCL § 522) or, circumstances having so changed as to make impracticable or impossible the literal carrying out of the purpose, a court (with the consent of the donor if living) permits otherwise (EPTL 8-1.1 [c]). But it is also apparent, for the reasons hereafter set forth, that the Legislature did not intend the stringent "as near as possible” standard of the common law to govern distribution of assets of a dissolving charitable corporation received other than through a will or other limiting instrument, but rather provided for distribution to corporations or organizations engaged in substantially similar activities and left it to the board of directors in the first instance to determine to whom distribution should be made.
 

 B
 

 The common-law cy pres doctrine, or "ancient doctrine of approximation” as it has been termed (Greenfield, Practice Commentary, McKinney’s Cons Laws of NY, Book 17B, EPTL 8-1.1, 1986 Cum Ann Pocket Part, p 175;
 
 see, Williams v Williams,
 
 8 NY 525), embodies the English concept that when a donor parts with his property for a charitable purpose it shall be forever devoted to that purpose, whether or not the particular donee continues to exist
 
 (Sherman v Richmond Hose Co.,
 
 230 NY 462). If the donee ceases to exist, the property may be devoted to a kindred charity; one that is, "as near as may be” to the charity contemplated by the donor
 
 (id.; see also, Matter of Goehringer,
 
 69 Misc 2d 145, 146-147; Restatement [Second] of Trusts § 399 comment a, at 297-298). The purpose of the doctrine was to prevent the failure of a charitable trust
 
 (see, e.g., Matter of Bowne,
 
 11 Misc 2d 597).
 

 The common-law doctrine was, however, held not to prevail in New York
 
 (Tilden v Green,
 
 130 NY 29, 45;
 
 Holland v Alcock,
 
 108 NY 312;
 
 see, Trustees of Sailors’ Snug Harbor v Carmody,
 
 211 NY 286, 297). By the so-called "Tilden” Law (L 1901, ch 291), which was thereafter incorporated in Personal Property Law § 12 and Real Property Law § 113
 
 (Trustees of Sailors’ Snug Harbor v Carmody,
 
 211 NY, at p 299,
 
 supra),
 
 New York courts were given cy pres power over charitable trusts. The statute, however, authorized the court having jurisdiction over the trust when it appeared that "circumstances have so changed * * * as to render impracticable or impossible a literal compliance with the terms of such instru
 
 *42
 
 ment [of gift]” to direct that the property "be administered or expended in such manner as in the judgment of the court
 
 will most effectually accomplish the general purpose
 
 of the instrument” pursuant to which the gift, grant, devise or bequest was received, but
 
 "without regard to and free from any specific restriction, limitation or direction contained therein”
 
 (emphasis supplied).
 

 A like provision was added to Personal Property Law § 12 by Laws of 1911 (ch 220), with respect to a voluntary association or committee which "shall have received by public subscription from contributors exceeding one thousand in number a fund for a charitable or benevolent purpose,” authorizing Supreme Court when "it shall appear that a literal compliance with the terms of the subscription is impracticable” to order that the balance of the fund "be transferred for administration to such domestic corporation as in the judgment of the court will
 
 most effectually accomplish the general purpose
 
 for which the fund shall have been collected,
 
 without regard to and free from any express or implied limitation, restriction or direction upon which the subscription shall have been made”
 
 (emphasis supplied).
 
 [7]
 

 And essentially the same provision was incorporated in Membership Corporations Law § 56 (5) by Laws of 1928 (ch 476). That provision authorized the court to order distribution of the property of a dissolved corporation "to such other corporation or association as shall be specified, to be administered or used in such manner as in the judgment of the court will
 
 best accomplish the general purposes
 
 for which the corporation so dissolved was organized or for which the property or funds are legally required to be used,
 
 without regard to and free from any express or implied restriction, limitation or direction imposed upon such corporation”
 
 (emphasis supplied).
 
 [8]
 

 It is, thus, apparent that for more than half a century the
 
 *43
 
 criterion governing distribution or dissolution has been not that the particular purpose of the donor be carried out "as near as possible,” but that the general purpose of the donor, or for which the corporation was organized or the fund collected be "most effectively [or best] accomplished[ed] * * * free from any express or implied restriction” and that the same standard has governed distribution of both the unexpended funds received for a charitable purpose by a membership corporation about to be dissolved, and the unexpended funds raised by a voluntary association through public subscription for a charitable purpose which has been accomplished.
 

 C
 

 The most immediately noticeable difference between N-PCL § 1005 (a) (3) (A) and the statutes we have so far considered is the changed standard governing distribution. The revision from "best accomplish the general purposes” to "engaged in activities substantially similar to those of the dissolved corporation” is not discussed in the legislative history of the N-PCL, but in light of the almost uniform standard of the various statutes discussed above and the provision of the Membership Corporations Law that distribution was to be "free from any express or implied restriction” imposed on the dissolving corporation, it is apparent that the "codification of the 'cypres’ doctrine” to which the Joint Legislative Committee Memorandum referred was to the doctrine as spelled out in the Membership Corporations Law (and other statutes referred to above) rather than to the common law "as near as possible” principle.
 
 [9]
 
 But beyond that the change to "substantially similar activities” from "best accomplishes” or "most effectively accomplishes” cannot be ignored, for, as the words are commonly understood, "substantially similar” is broader in scope and less limiting than "most effectively accomplishes”
 
 (cf. Matter of Falk,
 
 110 Misc 2d 104, 110).
 

 Of importance also is the fact that whereas the common-law rule was phrased in terms of the original purpose of the testator, grantor or donor (Bogert,
 
 op. cit.
 
 § 431, at 490; Restatement [Second] of Trusts § 399 comment b; 4 Scott, Trusts,
 
 op. cit.
 
 § 399, at 3084), as were all of the statutes referred to above, it is not the "purposes” but the "activities”
 
 *44
 
 of the dissolving corporation which under N-PCL § 1005 (a) (3) (A) governs the choice of recipient charities. Of course, that does not mean that a charitable corporation is not limited by the statement of purposes set forth in its charter
 
 (Alco Gravure,
 
 Inc.
 
 v Knapp Found.,
 
 64 NY2d 458); rather it means that to the extent that its activities have been more limited than the statement in its charter, the latter rather than the former must be taken into consideration in determining whether a proposed distributee meets the statutory test.
 

 Nor does respondents’ argument that the Joint Legislative Committee’s statement that section 1005 "makes very important innovations with respect to the distribution of corporate assets upon dissolution by adopting a 'cy-pres’ provision to regulate the distribution” (1969 NY Legis Ann, at 138; McKinney’s Cons Laws of NY, Book 37, pp xxi-xxii) establish the Legislature’s intent to adopt the common-law standard. As noted above, that standard in modified form had been applicable to membership corporations engaged in charitable pursuits as well as to voluntary associations since 1948 or earlier. Thus the innovation was not that for the first time cy pres became applicable but that the standard to be applied to property other than particular purpose assets of a type B not-for-profit corporation was whether the recipient charities were "engaged in activities substantially similar” rather than the modified common-law standard — "best accomplish the general purposes.”
 

 It follows that, as was held in
 
 Matter of Goehringer
 
 (69 Misc 2d, at pp 146-147,
 
 supra),
 
 statutes under which the assets of charitable corporations are distributed upon dissolution, such as N-PCL § 1005 (a) (3) (A) and Education Law § 220, are not quite like cy pres statutes such as EPTL 8-1.1 in that "[i]n ordering distribution under the dissolution statutes, the Supreme Court is not concerned with the directions or intentions of the creator or testator but only that the funds be transferred to a charitable recipient having similar purposes to the dissolved charitable corporation.” Although a cy pres concept is involved, it is not the strict standard of the common law that applies to distribution of the assets of a corporation being dissolved under the N-PCL, but a "quasi cy pres” standard
 
 (cf. Alco Gravure, Inc. v Knapp Found.,
 
 64 NY2d 458,
 
 supra).
 

 Ill
 

 The Appellate Division having used an improper standard,
 
 *45
 
 there must be a reversal, and because that improper standard resulted in a limited stipulation of fact rather than an evidentiary development of the factors involved in whether the plan for distribution should be approved, we remit to Supreme Court for such a hearing.
 

 In that connection we note the further substantial change made by the N-PCL in according the board of the dissolving charitable corporation a substantial role in the selection of the corporations or organizations to which distribution is to be made. At common law, framing the scheme for application or distribution of the property was a matter for the court, which could apply cy pres and frame a scheme to which the trustees did not consent
 
 (cf.
 
 L 1942, ch 535, McKinney’s Uncons Laws of NY § 4261), although the court would usually give weight to the wishes of the trustees (Restatement [Second] of Trusts § 399 comment f). And under Personal Property Law § 12 and Real Property Law § 113, that was true not only where a trust existed but also as to property held by a charitable corporation. "Over such gifts it [the court] is given general control and while it is said the court may make such an order 'on the application of the trustee or the person or corporation having the custody of the property’ the language should not be construed as limiting the power of the court to act only when application is so made. It may act on information by the state. It may act on its own motion”
 
 (Sherman v Richmond Hose Co.,
 
 230 NY, at p 473,
 
 supra).
 
 But, as already noted, under N-PCL § 1005 (a) (3) (A), it is the board of directors which adopts the plan of distribution pursuant to which the successor corporation or organization will receive the property and the plan is not submitted to the court for approval until after it has been submitted to and approved by the members entitled to vote.
 

 The approval of the court is not under the statute to be perfunctory, but in enacting N-PCL article 10, the Legislature "substantially revise[d] the existing law governing membership corporations” (1969 NY Legis Ann, at 138; McKinney’s Cons Laws of NY, Book 37, p xxi), "require[d] a board resolution recommending the plan” (1969 NY Legis Ann, at 139; McKinney’s Cons Laws of NY, Book 37, p xxiii) and that "the plan of distribution * * * be approved by a justice of the supreme court”
 
 (id).
 
 It intended also that not-for-profit corporations have "a strong board of directors” (1969 NY Legis Ann, at 135; McKinney’s Cons Laws of NY, Book 37, p xviii). Although a court, asked to approve a plan of distribution, acts
 
 *46
 
 in a discretionary capacity, so likewise does the board in carrying out its more formal role in devising a plan which the N-PCL has given it. Therefore, its choice of acquiring organizations and corporations should not be lightly set aside.
 

 A further factor to be considered in assessing the propriety of the plan is how the funds, of which the moneys now in the hands of the board are the residue, were acquired. It has already been noted (n 5 above) that there is no record evidence of any "particular purpose” gifts by will or other instrument. There are in the record letters and petitions addressed to the Attorney-General or the New York City Chapter stating the signers’ belief that distribution should be to the chapter, but nothing to establish that any limitation other than the MSSO charter applied to their gifts when made. Was a public solicitation made and, if so, what was said about use of the funds by MSSO or by the donor?
 
 (Cf
 
 N-PCL § 102 [a] [14].) Absent an express or implied representation by MSSO, no "particular purpose” is established
 
 (Lefkowitz v Cornell Univ.,
 
 28 NY2d 876,
 
 affg on App Div opn
 
 35 AD2d 166) and it will be assumed that contributions made voluntarily and without restriction are general gifts for use by the charitable corporation for any of its general corporate purposes
 
 (Cadman Mem. Cong. Socy. v Kenyon,
 
 306 NY 151, 166). A "particular purpose” may also be established by the donor but it will usually be the case that, as noted in
 
 Loch v Mayer
 
 (50 Misc 442, 448, dealing with a disaster relief fund solicited by a church), "[f]cw donations were accompanied with writings of any kind, and no such writing, so far as the evidence shows, states with any attempt at precision the terms of the trust.” As to any contribution found to have been made for a restricted purpose, it will also be of importance whether it has been fully expended.
 

 Relevant also, as already noted, will be the activities of the corporation in fact carried out under its charter, and to a lesser extent the corporate purposes stated in the charter. Specifically, in terms of the present case has the emphasis of MSSO as shown by its creation and its activities been on the
 
 disease
 
 or on
 
 service?
 
 Both are specifically mentioned in its name and both are referred to in the statement of its purposes contained in its amended certificate of incorporation.
 

 For the foregoing reasons, the judgment appealed from and the order of the Appellate Division brought up for review should be reversed, with costs to appellants, and the matter
 
 *47
 
 remitted to Supreme Court, Kings County, for further proceedings in accordance with this opinion.
 

 Chief Judge Wachtler and Judges Simons, Kaye, Alexander and Hancock, Jr., concur; Judge Titone taking no part.
 

 Judgment appealed from and order of the Appellate Division brought up for review reversed, etc.
 

 [1]
 

 . N-PCL § 201 (b) provides that a type B corporation "may be formed for any one or more of the following non-business purposes: charitable, educational, religious, scientific, literary, cultural or for the prevention of cruelty to children or animals.”
 

 [2]
 

 . The New York City Chapter in an affidavit of its executive director disputes that allegation.
 

 [3]
 

 . Blueberry assists mentally disturbed and multihandicapped children between the ages of 3 and 18. It provides a day-care and service center as well as a residential program for the most seriously afflicted. ARC serves mentally retarded adults through three programs which include residential care, a sheltered workshop where job skills are taught, and weekend education and recreation programs. Vacations and Community Services helps those suffering from blindness and visual loss in both community-based programs in metropolitan New York and at an upstate vacation camp. Children’s Oncology services children who suffer from cancer, providing a residence where children can live with their families while undergoing treatment at two New York hospitals.
 

 [4]
 

 . Judicial dissolution is governed by article 11, but section 1115 of the article makes sections 1005 through 1008 of article 10 applicable also to a judicially dissolved corporation.
 

 [5]
 

 . Assets legally required to be used for a particular purpose are those received pursuant to a will or other instrument limiting the purpose for which the assets may be used. N-PCL § 513 provides that although a type B corporation holds full ownership rights in property received in trust for, or with direction to apply the same to, a purpose specified in its certificate of incorporation, it "shall not be deemed a trustee of an express trust of such assets” (§ 513 [a]) but is required to "apply all assets thus received to the purposes specified in the gift instrument” (§ 513 [b]) except as permitted by
 
 *40
 
 EPTL article 8 or N-PCL §522. The record does not indicate that MSSO holds any "particular purpose” assets.
 

 [6]
 

 . The second sentence of section 1005 (a) (3) (A) permits a receiving corporation to take as successor of the dissolved corporation property given by will or other instrument to the dissolved corporation, but consistently with § 513 requires that the property "shall be devoted by the acquiring corporation or organization to the purposes intended by the testator, donor or grantor.” The New York City Chapter and the Attorney-General argue that the second sentence (and the similar provision of EPTL 8-1.1) must be read to restrict the meaning of "substantially similar” as used in the first sentence. They reason that otherwise a corporation or organization selected as distributee of property other than "particular purpose” assets will also receive "particular purpose” assets despite the fact that they do not meet the more restrictive standard applicable to them. The provisions can, however, be harmonized
 
 (see,
 
 McKinney’s Cons Laws of NY, Book 1, Statutes § 98) by construing the first sentence as permitting distribution to one or more organizations "engaged in activities substantially similar” to those of the dissolving corporation but free from any express or implied restriction imposed upon that corporation
 
 (cf.
 
 Membership Corporations Law § 56 [5]), but the second sentence as requiring that with respect to a gift or bequest by will or other instrument the intent of the testator, donor or grantor be preserved in the selection of a substitute recipient of a "particular purpose” gift or bequest. Under that construction the gift or bequest will not pass automatically to a corporation simply because it has previously received a distribution on dissolution from the corporation named as recipient in the will or other instrument. Rather, the Supreme Court or Surrogate’s Court administering the estate or trust from which comes the gift or bequest, applying the provisions of the second sentence and of EPTL 8-1.1, will direct that the property pass to a charitable corporation that meets the more restrictive cy pres standard of those provisions
 
 (see, Matter of Goehringer,
 
 69 Misc 2d 145, 147-148). As to a distribution or dissolution under the first sentence, however, the recipient organization is, as was the case under the Membership Corporations Law, permitted to use the property free of restriction, it being sufficient that its activities are substantially similar to those of the original recipient.
 

 [7]
 

 . The provisions of the Personal Property Law and Real Property Law dealing with charitable trusts and charitable subscription to voluntary associations are now contained in EPTL 8-1.1 (c) and (j), with but slight change in language (among the changes, the substitution of "effectively” for "effectually”).
 

 [8]
 

 . The subdivision was amended by Laws of 1948 (ch 788) to include a last sentence preserving for the receiving corporation bequests and grants, whether made before or after dissolution, intended for the benefit of the dissolved corporation. Except for the deletion of the word "all” before "such” and the substitution of "disposition” for "devises, bequest, gifts or grants,” the proviso of the last sentence of N-PCL § 1005 (a) (3) (A) and that of Membership Corporations Law § 56 (5) are worded identically.
 

 [9]
 

 . The N-PCL § 513 (b) reference to EPTL article 8, which contains, although for a different purpose, language paralleling that of the Membership Corporations Law, supports that inference.